Irving Lang, J.
Defendants were arrested on October 29,1971 and charged with possession of 10,952 hags of heroin. Subsequently indicted for criminal possession of a dangerous drug in the first degree, the defendants move to suppress the physical evidence and statements attributed to them on constitutional grounds.[1]
On the hearing on the motion, Patrolman Louis Anemone and Patrolman Donald Sherwood testified for the People. Patrolmen Joseph Failla, Gerald Flaherty and Edward Bentley were called as witnesses by the defense, Charles Cameron also testified in his own behalf.
A principal issue to be resolved on this motion is one of credibility. The hearing produced some minor contradictions between *792 the officers’ testimony and for the most part, there was a direct conflict between the police testimony and the testimony of defendant Cameron.
In resolving .such contradictions and conflicts, I have taken consideration of the witnesses’ demeanor, candor, experience and intelligence. Furthermore, in regard to the officers’ testimony I have considered the fact that detailed notes relating to the events in this case were written in their memorandum books, a commendable, indeed essential practice, too often ignored by police in many cases.
I make these findings of fact:
On October 28,1971, Patrolmen Louis Anemone, Joseph Failla and Edward Bentley were on anticrime patrol, in plain clothes and in an unmarked car, in the vicinity of Bennett Avenue in the Washington Heights section of Manhattan. At approximately 12:30 a.m. to approximately 2:00 a.m. they saw a trio of late model Cadillacs, two with out-of-State license plates, double parked in front of 179 Bennett Avenue, a 10-story apartment house. At about 2:00 a.m. they saw three men leave the building and drive away, respectively. The next day, before beginning their tour of duty, the officers were given a ‘ ‘ condition slip ” that there was a report of “ sex and drugs ” in apartment 4D at 179 Bennett Avenue. The slip was anonymous and contained no further specifics.
At about 12:45 a.m. on October 29, 1971, the officers saw two Cadillacs again double parked in front of the building. Shortly thereafter, the third Cadillac reappeared. Stationing themselves about 100 feet north of the building, at about 1:30 a.m. they observed defendants Cameron and McCoy exit the building. McCoy, who was recognized from the night before, was carrying a black satchel. He handed the satchel to Cameron and then both got into the car with the New Jersey plates. McCoy was the driver. The defendants ’ car proceeded south until the intersection of Bennett Avenue and 181st Street where they stopped and made a right turn. At this intersection a radio car, occupied by Patrolmen Flaherty and Sherwood was stationed. When the unmarked ear reached the intersection it stopped alongside the radio car and a conversation ensued. Thereafter, the radio car, with red lights blinking, pursued defendants’ car until it reached Haven Avenue and 181st Street and beeped its horn for defendants to pull over. Patrolman Flaherty motioned to McCoy to come back to the radio car and he did so. Cameron remained in the Cadillac. Patrolman Flaherty noted in his memorandum book that he stopped a “ suspicious car.”
*793 Momentarily the unmarked car appeared and pulled up in front of the Cadillac. All three officérs left their car. Patrolmen Failla and Anemone walked toward Cameron who was sitting in his car. Patrolmap Bentley stationed himself on the sidewalk at the rear of the Cadillac. Patrolman Anemone identified himself and asked Cameron “if he would please remove the bag from the car, we would like to have a look in it.” Cameron replied, “it is not my bag, I won’t touch it.” The bag, at the time was on the floor by the front seat. Anemone and Failla then walked toward McCoy and the radio car. Cameron without being askéd left his car and followed them. Anemone told McCoy that Cameron said the bag wasn’t his and that “ we would like a look. ” McCoy replied the bag belonged to the man who owned the car. The car registration was made opt to one Joanna Edwards. By this time, the defendants and the officers had walked back to the Cadillac. Anemone, addressing both of them, asked “ if it does not belong to you, you don’t mind if I have a look in it, do you? ” Cameron shrugged. McCoy answered “ Go ahead.”
At this time the officers and the defendants were standing in sort of a semicircle.
Patrolman Anemone removed the satchel and unzippered it. Upon discovering its contents he let off a scream — “Holy Cow” — in response to which McCoy said “You’re acting like a kid, you think you really got something there.”
Defendants were told they were under arrest and advised of their rights. Patrolman Bentley then got into the rear seat of the radio car with the defendants and as they were taken to the station house Cameron said “ You don’t have shit, this is illegal search and seizure.” Bentley replied, “ Well, we will see.”
Later, Cameron inquired of Patrolman Anemone about the grade felony he would be charged with and requested the officer contact his lawyer or family.
The People argue that the search and seizure of the bag containing the heroin is sustainable under one or more of the following theories: (1) That the search and seizure was incident to a lawful arrest; (2) That the defendants abandoned the satchel; (3) That the defendants consented to the search and seizure.
PROBABLE CAUSE TO ARREST
The general rule is that all warrantless searches are per se unreasonable under the Fourth Amendment, subject tó a few specifically established exceptions (Katz v. United States, 389 *794 U. S. 347) one of which is a search incident to a lawful arrest (People v. Loria, 10 N Y 2d 368; Chimel v. California, 395 U. S. 752). An arrest is lawful when it is based on probable cause —facts and circumstances such as to warrant a man of prudence and caution in believing that a crime has been or is being committed in his presence (GPL 140.10, 140.25; Stacey v. Emery, 97 U. S. 642; Brinegar v. United States, 338 U. S. 160). In determining if a police officer has sufficient probable cause in a given situation, many factors must be considered: the officer’s experience, training and expertise; his intelligence and his street knowledge; the circumstances of the time and place — the area, its'population, the time of day of the events. “ In. dealing with probable cause * * * we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men * * * act. ” (Brinegar v. United States, supra, p. 175). As it applies to police, the standard is that which would be probable cause to a reasonable, cautious, prudent police officer. (People v. Valentine, 17 N Y 2d 128.)
Here Officers Anemone, Failla and Bentley observed three Cadillacs double parked in front of 179 Bennett Avenue on October 28, 1971 while on routine patrol. They , saw three men leave the building, get into the cars and depart. There was no suggestion of criminal activity. When the officers were given the “ condition slip ” with a report of sex and drugs in Apartment 4D at 179 Bennett Avenue, they may have mentally connected'it to their observations the night before. Certainly the officers could and did make further observation at that address. But the observations on October 29 in and of itself were also innocent. The fact that the officers saw the two defendants carrying a bag out of the building and get into a late model car with out-of-State plates did not give rise to an inference of criminal activity. (Spinelli v. United States, 393 U. S. 410: United States v. Nicholas, 448 F. 2d 622 [8th Cir., 1971].) Officer Anemone testified that these observations made him suspicious. Of course, just like anyone else, a police officer is entitled to have a hunch. A suspicious nature is a commendable trait in a police officer. Having such suspicions, the officers were entitled to investigate and explore them in a lawful manner, including the stopping of the defendants to inquire further.
While the reasons behind the officers’ decision to contact the radio car and have the officers in that car make the initial stop of the defendants, are unknown to this court, it may be assumed *795 that it was part of some plan to investigate the defendants’ activity. Such assumption is buttressed by the entries in Officer Flaherty’s memorandum book that they stopped a “ suspicious car. ’ ’
Although the court does not condone, the indiscriminate stopping and interrogation of citizens at the whim of the police, the police do have a right to detain, make inquiry, and investigate persons upon justifiable suspicion. Police have the duties of crime prevention and detection as well as apprehension. Police officers may approach a suspect, observe him and his possessions, ask for identification and an explanation of his conduct at the time. (GPL 140.50, subd. 1; Terry v. Ohio, 392 U. S. 1; People v. Rivera, 14 N Y 2d 441; People v. Rosemond, 26 N Y 2d 101.)
The stopping of the defendants, by itself, does not constitute an arrest. (Rios v. United States, 364 U. S. 253; People v. Entrialgo, 19 AD 2d 509, affd. 14 N Y 2d 733; United States v. Vita, 294 F. 2d 524, cert. den. 369 U. S. 823.)
Defendants contend, the People concede and this court concurs that up until the time the car was stopped there was no probable cause to arrest and search. While suspicion was present, suspicion is not probable cause. (Jones v. United States, 357 U. S. 493; Agnello v. United States, 269 U. S. 20; People v. Brown, 24 N Y 2d 421.) But the People make claim that circumstances after the stop and prior to the search— namely the statements made by the defendants regarding the bag — elevate that suspicion to the level of probable cause. If so, the automobile may be searched and the bag seized and opened. (Carroll v. United States, 267 U. S. 132, Brinegar v. United States, 338 U. S. 160, supra.)
I agree that probable cause must be found, if at all, by looking at the totality of the circumstances. Thus, acts in consequence of the initial stop and inquiry must be examined. Officer Anemone testified that he approached defendant Cameron, who was sitting in the car, and asked if he could see the bag. Cameron replied, “ It is not my bag, I won’t touch it.” Making the same request of McCoy, McCoy responded, “ It belongs to the man who owns the car.” The People contend that such denial of ownership, in light of the officer’s personal observations of defendants carrying the bag out of 179 Bennett Avenue, creates probable cause. While obvious falsehoods following questioning by the police based on their personal observations may, in the proper case, constitute probable cause (People v. Brady, 16 N Y 2d 186), such is not the situation here. At most, their *796 response -may be interpreted as a denial of ownership. This ■is not the same as a denial of possession. While the statements might have served to increase suspicion and proceed with further investigation, suspicion it remained and there is more than a fine line between suspicion and probable cause.
Upon examining all the circumstances, I find that the officers did not have probable cause to arrest and search the defendants and their car and the search cannot be sustained as incident to a lawful arrest. In coming to such conclusion I have considered the following: (1) at no time, from the initial observations on October 28 to the time of the actual search, were the officers investigating any particular crime;- (2) there were no observations or information that these defendants were engaged in any criminal activity; in fact, both defendants were unknown to all the officers; (3) the report of sex and drugs in Apartment 4D in the condition slip was too vague to connect defendants with that report;[2] (4) there was no testimony that the black bag was a common or known means of transporting narcotics; (5) after they were stopped, defendants committed no acts which might constitute any consciousness of guilt; (6) the defendants’ denial of ownership of the bag, while possibly evasive, did not create probable cause that the bag contained any Contraband. A hunch, healthily conceived, but remaining unnourished, does not ripen into probable cause by a successful search.
In fact, the entire circumstances surrounding the stop, inquiry.- and search are contrary to the" usual incidents surrounding a narcotics arrest. The defendants were given considerable liberty of movement in the investigation area; no guns were drawn prior to questioning; defendants were not frisked for weapons, the officer going from one defendant to another to ask permission to look at the bag and especially Officer Anemone’s reaction (“Holy Cow”) when he opened the bag are indicia of the officers’ state of mind that they too were not quite sure -of what they would find. Accordingly, I find no probable cause to arrest and search incident thereto.
ABANDONMENT
The People’s second contention is that when defendants McCoy and Cameron denied ownership of the bag, the bag was *797 in effect abandoned and could be seized without violation of the Fourth Amendment.
While abandoned property is always subject to seizure (People v. Pittman, 14 N Y 2d 885; People v. D’Ambrosio, 28 A D 2d 1130; Hester v. United States, 265 U. S. 57), proof of intent to discard and abandon must be shown. (People v. Anderson, 24 N Y 2d 12.) Mere denial of ownership is not proof of an intent to abandon. The bag was not thrown from the car. It remained under the seat. Defendants, as already stated, only denied ownership,, not possession. There is a great deal of difference between denial of ownership of property on a public street where no possession is claimed or indicated and denial of ownership of property in a car where possession is conceded, although ownership denied. (See Rios v. United States, 364 U. S. 253, supra; People v. Adorno, 37 Misc 2d 36.) I therefore find no abandonment in this case.
CONSENT
Lastly, the People contend that the defendants consented to the search and seizure of the satchel.
Consent, being a waiver of a constitutional right, will not be lightly inferred (Johnson v. Zerbst, 304 U. S. 458 [1938]; United States v. Como, 340 F. 2d 891 [2d Cir., 1965]) and the People have a heavy burden of proving that the consent was knowingly, freely and intelligently given (Bumper v. North Carolina, 391 U. S. 543 [1968]; People v. Whitehurst, 25 N Y 2d 389 [1969]). Whether consent was freely given or whether there was mere submission to lawful authority must be determined by the facts and circumstances of each individual case (Hoover v. Beto, 439 F. 2d 913 [5th Cir., 1971]).
Among factors to be considered are the setting in which consent was obtained and the statements and acts of the parties present. (United States ex rel. Harris v. Hendricks, 423 F. 2d 1096 [3d Cir., 1970]). The determination rests ultimately on the interplay of all those various factors and their probative effect on the individual defendants in light of their own actions.
In this case, the defendants were initially stopped in a residential neighborhood, at about 2:00 a.m. by a radio police car with red blinking lights. Shortly thereafter, another car, containing police officers, arrived on the scene and parked itself in front of the defendants’ car. In total, there were five officers on the scene. Defendants argue that such a setting creates an inherently coercive atmosphere so as to vitiate the giving of a valid consent.
*798 While the presence of police often carries with it an aura of coercion, this is not to say that every police-on-the-,scene situation precludes a valid voluntary consent to a search. To hold so would be to presume that the task of law enforcement and criminal detection is antithetical to the full preservation of constitutional freedom. Absent any coercive acts or words, the fact of their number, their equipment and that they are police does not add up to coercion per se (United States v. Thompson, 356 F. 2d 216 [2d Cir., 1965], cert. den. 384 U. S. 964 [1966]).
If consent was voluntary and freely given, the court must necessarily delve into the defendants ’ state of mind as evidenced by their actions under the circumstances. After defendants were stopped they were not under arrest. While detained, they were afforded considerable freedom of action and movement. When Patrolmen Anemone and Failla approached Cameron, he was sitting in the Cadillac. He was not asked to get out. His denial of ownership after the request to ,see the bag was not met with abuse or threats. To the contrary, the officers accepted hi's response and walked away from him. Cameron then left the car, on his own, and followed after them. His freedom of movement was not interfered with. Although, Patrolman Bentley was stationed at the perimeter of the area, he did not approach Cameron or limit his movement. It would thus seem that Bentley’s position was one of convenience and routine police procedure rather than a tactic of restraint. Patrolman Anemone then requested permission from McCoy to search the bag. He too denied ownership. This evinces a state of mind indicating he was at liberty to avoid the request. The officer, logically expounding on their replies then stated ‘ ‘ well if it don’t belong to you [addressing both defendants], you don’t mind if I have a look in it, do you? ”
The defendants each made a choice. Cameron shrugged. McCoy said, “ Go ahead.”
Consent must be unequivocal. While I find Cameron’s shrugging to be voluntary, his actions are insufficient to constitute consent. McCoy’s response was precise. He told the officers to “ go ahead. ’ ’ There is no evidence that the officers threatened or pressured, actual or psychological, McCoy into giving consent. There was no dramatic excitement of drawn guns (Weed v. United States, 340 F. 2d 827 [10th Cir., 1965]). They were not subjected to exhaustive interrogation or persistent demands. They were not frisked.
A person need not have a positive desire that a search be conducted in order for his consent to bo voluntary and effective *799 (United States v. Thompson, 356 F. 2d 216, cert. den. 384 U. S. 964, supra). The pressure exerted on a person by the realization that exposure may be imminent is far different from the deliberate or ignorant violation of a personal right that renders apparent consent ineffective (Gorman v. United States, 380 F. 2d 158, 165 [1st Cir., 1967]). Bowing to events, even unhappily, cannot be equated with coercion (Robbins v. MacKenzie, 364 F. 2d 45, 50, cert. den. 385 U. S. 913 [1966]).
As stated by the court in United States v. Gorman (355 F. 2d 151, 159 [2d Cir., 1965]): ‘ ‘ Where, as here, no force or deception was either used or threatened, we see no reason why a court should disregard a suspect’s expression of consent simply because efficient and lawful investigation and his own attempt to avoid apprehension had produced a situation where he could hardly avoid giving it.”
In United States v. Fields (458 F. 2d 1194 [3d Cir., 1972]), similar to the case at bar, Federal agents observed Davis, Fields and a Mrs. Butler at Pittsburgh airport. The agents had information that Davis and Fields might be involved in narcotic traffic. Mrs. Butler was unknown to them. After about 30 minutes of observation (which revealed nothing incriminating) two agents approached Fields and Mrs. Butler. One agent asked her what was in her flight bag. She replied (p. 1196) “ I don’t know, its [Fields’].” Fields then stated, “ It is not! It is none of mine.” The officer asked if she would mind if he looked into the bag. She replied again (p. 1197) “ No, it is not mine ” and handed the bag to the officer. In upholding the conviction, the court held that although there was no probable cause to search the bag, the officers had sufficient suspicion to stop the defendants, make inquiry and request permission to examine the bag. In finding that Mrs. Butler consented to the search of the bag, the court noted that the fact she was responding to a request by an officer does not alone make her acquiescence involuntary. There was nothing else to indicate coercion. ‘ ‘ The officers made no show of force and they made no threats. They did not exert pressure upon [her] in any way.” (p. 1198).
Defendant McCoy argues that knowing what the search would reveal, it would be inconceivable that he would consent to it. While this is a logical argument, it cannot be converted into a steadfast rule when dealing with human beings in human situations. If we follow the argument to its ultimate conclusion then we would have to say that it would be inconceivable that a person would voluntarily confess to a homicide where there was no other evidence of guilt. Yet we know that many people *800 confess to such crimes for manifold reasons. In the instant case we do not even have to postulate a psychoanalytic cause such as Freud’s assertion that mortals cannot keep secrets and that “ self-betrayal oozes from all pores.” Nor do we have to examine Theodore Reik’s “ The Compulsion to Confess.” Under the circumstances McCoy may have believed that the best course of action would have been to appear to co-operate, thus setting the stage for a claim that he borrowed the car with a bag in it belonging to the owner, the contents of which he was unaware. Indeed, Cameron testified that the bag belonged to him and that McCoy was unaware of its contents.
In other words, the fact that McCoy’s answer was not in his ultimate best interests does not, a fortiori, mean that it was involuntarily selected (Leavitt v. Howard, 462 F. 2d 992 [1st Cir., 1972]).
No coercion is evident. Each defendant made a choice. Cameron chose to shrug and be silent, a shrewd and passive maneuver which maintained the status quo. McCoy chose to speak and say “ Go ahead,” a verbal gambit which failed.
The issue has been raised as to whether the defendants had to be advised of their rights to refuse a search before a valid consent could be given. Consent must be intelligently made. While there is some evidence that Cameron was knowledgeable in the law of search and seizure, there is no evidence that McCoy interested himself in legal studies. However, there is no requirement that consent to search must be preceded by a specific discussion of the Fourth Amendment (United States v. Goosbey, 419 F. 2d 818 [6th Cir., 1970]). While some courts have searched for an analogy with Miranda v. Arizona (384 U. S. 436) there is great authority that the theory behind Miranda ought not to be mechanically duplicated when circumstances indicate the advisability of requesting a search. (Gorman v. United States, supra; United States v. Mallory, 460 F. 2d 243 [10th Cir., 1972]; Government of Virgin Is. v. Berne, 412 F. 2d 1055 [3d Cir., 1969], cert. den. 396 U. S. 837 [1969]; White v. United States, 444 F. 2d 724 [10th Cir., 1971]; United States ex rel. Combs v. La Vallee, 417 F. 2d 523 [2d Cir., 1969], cert. den. 397 U. S. 1002 [1970]; Leeper v. United States, 446 F. 2d 281 [10th Cir., 1971], cert. den. 404 U. S. 1021].)
Accordingly, I find that McCoy knowingly, intelligently and voluntarily consented to the search of the bag in the car he was driving. There being evidence that both defendants were at some time in possession of the bag. and passengers in thq *801 car, the evidence is admissible against both of them. The defendants are also presumed to possess the narcotics under section 220.25 of the Penal Law.
The motion to suppress the physical evidence is denied.
Statements
Regarding the admissibility of the statements made by McCoy, in response to Patrolman Anemone’s exclamation — ‘1 Holy Cow ” — I find that they were admissible spontaneous declarations (People v. Kaye, 25 N Y 2d 139, 144). Regarding the statements made by Cameron after his arrest and after being advised of his rights, — “ You don’t have shit, this is an illegal search and seizure ” — I find they were voluntarily ¡made. However, the fact that statements may be admissible 4s not having been obtained in violation of a defendant’s constitutional rights does not necessarily mean that they are admissible under evidentiary rules relating to relevance, probity or prejudice. The latter determinations are left to the Trial Judge.
The motion to suppress statements is denied.
The defendants are held for trial.

. The defendants also attacked the constitutionality of the statute (Penal Law, § 220.23) making it a Class A felony to possess more than a pound of material containing narcotics in any percentage as a violation, inter alia, of equal protection and due process. The court denied this portion of the motion orally in the light of People v. Daneff (30 N Y 2d 793 [1972]),

. The report was multiple hearsay. Anemone got it from a patrolman, who got it from a sergeant, who got it from a captain, who got it from a concerned citizen at a community council meeting who wished to remain anonymous. There is no testimonial connection between the defendants .and the apartment.