*736 OPINION OF THE COURT
Vincent M. Del Giudice, J.
The defendant is charged with criminal possession of a weapon in the second degree. A Mapp/Huntley hearing was conducted before this court on June 5, 2012. The People presented two witnesses: Police Officer Gabriel Cuevas and Cesar Pabon.[1] I found their testimony to be credible, reliable and worthy of belief to the extent indicated in this opinion.
Findings of Fact
On February 5, 2011, at approximately 5:30 a.m., Cesar Pabon, 21, was visiting his friends, Emerson and Hernán Hernandez, both of whom lived on the second floor of 36 Starr Street. Mr. Pabon’s grandmother, Elsa Diaz, also lived in that building, in apartment 1L, which is on the first floor at the far end of the entrance hallway. While Pabon was talking with Elsa Diaz, who Pabon testified was intoxicated, in the first floor hallway, an intoxicated Hector Perez walked out of apartment 1L. Pabon had seen Perez in his grandmother’s apartment previously, but she had assured him that Perez did not live with her. At this point, Perez and Diaz began arguing. Perez interrupted the argument to go back inside apartment 1L and quickly reemerged brandishing a chrome handgun with a “brownish dark cover.” Perez then pointed the gun at Pabon and waved it around.
Pabon went into his friends’ second floor apartment and Perez returned inside apartment 1L. Pabon’s friends’ mother, who lived in the second floor apartment, came outside of her apartment when she overheard the commotion downstairs and called the police.
Later, Pabon went back to the lobby and observed Perez exit apartment 1L. Pabon thought Perez might have a weapon tucked into the back of his shirt because his shirt “wasn’t right.” Perez then went downstairs to the basement of the building, urging anyone interested to come downstairs to fight.
Emerson Hernandez followed Perez downstairs. Pabon then heard a commotion and Hernandez returned to the lobby appearing physically injured. Pabon and Emerson and Hernán Hernandez then descended to the basement and physically assaulted Perez. Shortly thereafter, the three young men returned upstairs and trapped Perez in the basement by locking the door that leads to the basement from the lobby.
*737 At approximately 5:45 a.m., Police Officer Gabriel Cuevas, accompanied by Police Officer Regnier, while on routine patrol, received a radio report of fighting and someone with a gun at 36 Starr Street. The officers responded to the location. At 5:50 a.m., the officers briefly canvassed the exterior of the building before entering the three-story residential building.
Upon entering the building, Officer Cuevas saw a group of young men standing on the steps of the stairway, arguing with a 40-year-old man (later identified as Hector Perez) who appeared beaten up. Perez was screaming and challenging the young men to a fight. In response to police questioning, the young men stated that Perez had pointed a silver firearm in their direction and that they had assaulted him in self-defense. They also advised the officers that Perez had retreated to the basement after pointing a firearm at them.
Numerous police officers then searched the basement for a firearm, without success. All told, there were approximately 14 uniform and plainclothes members of law enforcement at the location.
Upon returning to the lobby from a brief peek into the basement, Officer Cuevas noticed a very skinny woman, between 50 and 60 years of age, dressed in a bathrobe, who he later learned to be Elsa Diaz, looking frantic and shaking and mumbling. Officer Cuevas approached Elsa Diaz and asked her if she was alright. She stated she did not need his help. Officer Cuevas then asked Diaz whether she lived at that location. Elsa Diaz advised him that not only did she live in the first floor apartment but Hector Perez also lived there. Officer Cuevas then asked Ms. Diaz if she was aware of a gun in her apartment. Ms. Diaz did not answer. Officer Cuevas then asked if he could search her apartment. Ms. Diaz then said she was not aware of any gun in the apartment. Officer Cuevas warned Diaz that if she did not allow the police to search her apartment, he would get trained police dogs to search the apartment and the police would arrest her if they found a gun within the apartment. At this point, Diaz reluctantly agreed to let the officers search her apartment.
Officer Cuevas went to his patrol car and retrieved a consent-to-search form, which he then translated, line by line, from English to Spanish for Elsa Diaz. Officer Cuevas filled out Ms. Diaz’s name, date of birth and the location of the residence. After signing the consent-to-search form (People’s exhibit No. 1), Ms. Diaz pointed towards the bedroom in the rear of the apartment. Once inside the bedroom, Ms. Diaz told Officer Cuevas that the *738 left side (north side) of the bedroom was “his side” and that the right side was “her side.” After searching a dresser on the left side and finding men’s clothing but no contraband, Officer Cuevas searched a filing cabinet on the east side of the room, where he discovered an unloaded revolver next to a box containing 50 rounds of ammunition.
Officer Cuevas left the bedroom, with Ms. Diaz, and returned with Officer Pedrick, who promptly removed the firearm from the filing cabinet in the presence of Ms. Diaz. When Officer Pedrick extracted the firearm from the filing cabinet, Ms. Diaz started screaming, crying, and flailing her arms, requiring her to be temporarily handcuffed by Officer Pedrick.
Officer Pedrick then went to the Hernandez’s second floor apartment and Cesar Pabon identified the gun recovered as the same weapon that Perez had earlier displayed. Officer Cuevas then showed the weapon to the defendant, who had been seated on the floor of the lobby, and asked him if the gun was his.[2] Perez denied ownership of the weapon. Defendant was arrested and taken to the 83rd Precinct. While answering pedigree questions with the desk officer, the defendant stated that his current address was 633 Hart Street and then admitted owning the revolver.
The defendant was secured in a holding cell. Defendant asked Officer Cuevas what he was being charged with. Officer Cuevas responded that he was being charged with criminal possession of a weapon. The defendant then stated that because the gun was not loaded, he couldn’t be charged with a felony. The police never interrogated the defendant.
After both parties had filed written memoranda of law, the People filed a motion seeking to, once again, reopen the suppression hearing in order to introduce into evidence the defendant’s sworn testimony before the grand jury. The People claimed that during the defendant’s grand jury testimony, he denied any privacy interest in the gun that was seized by the police and claimed he did not live in Ms. Diaz’s apartment, but merely stayed there one or two nights every weekend for the past year. The defendant filed papers opposing the People’s request to reopen the hearing.
After hearing oral arguments, the court, in its discretion, granted the People’s request to reopen the hearing and admitted the transcribed grand jury testimony of the defendant as People’s exhibit No. 3.
*739 Conclusions of Law
A warrantless search of an individual’s home or personal effects is per se unreasonable and, therefore, there is a presumption that such searches are unconstitutional (Schneckloth v Bustamonte, 412 US 218, 219 [1973]; People v Hodge, 44 NY2d 553, 557 [1978]). “Courts have long recognized that the Fourth Amendment is not violated every time police enter a private premises without a warrant. Indeed, though warrantless entries into a home are presumptively unreasonable, the touchstone of the Fourth Amendment is reasonableness — not the warrant requirement” (People v Molnar, 98 NY2d 328, 331 [2002] [citations, internal quotation marks and brackets omitted]; People v Rodriguez, 77 AD3d 280, 283 [2d Dept 2010], lv denied 15 NY3d 955 [2010]). The prosecution rebuts this presumption only when it presents facts that establish an applicable exception to the warrant requirement (Vale v Louisiana, 399 US 30, 34 [1970]; People v Pettinato, 69 NY2d 653, 654 [1986]; People v Calhoun, 49 NY2d 398, 402 [1980]). The burden of proving the existence of an exception to the search warrant requirement is strictly on the prosecution, and that burden is even greater when there is ample opportunity to obtain a warrant (People v Knapp, 52 NY2d 689, 697 [1981]; People v Mojica-Sanchez, 90 AD3d 488, 489 [1st Dept 2011], lv denied 18 NY3d 960 [2012]).
“The invocation of the right to be secure against unreasonable searches and seizures and its exclusionary enforcement require personal standing to challenge the government’s action” (People v Rodriguez, 69 NY2d 159, 161 [1987] [citations omitted]; see also Rakas v Illinois, 439 US 128 [1978]). The defendant bears the burden of establishing a reasonable expectation of privacy in the premises searched or in the item seized (People v Ponder, 54 NY2d 160, 166 [1981]). A reasonable expectation of privacy involves both a subjective and an objective component (People v Ramirez-Portoreal, 88 NY2d 99, 108 [1996]). The defendant must establish that he exhibited a legitimate expectation of privacy in the area searched, or in the item seized, by taking steps to preserve the property in a private manner (Ramirez-Portoreal, 88 NY2d at 109). In addition, the court must be satisfied that society would recognize the defendant’s expectation of privacy as reasonable (id.).
“The number of times a person stays in a particular place, the length and nature of the stay, the indicia of connectedness and privacy, like change of clothes or sharing expenses or household burdens, are all *740 factors which may alone or in combination with other factors support a reasonable expectation of privacy which is protected by the Fourth Amendment” (Rodriguez, 69 NY2d at 163).
When a defendant argues that physical evidence must be suppressed, he must first have standing to challenge either the initial intrusion by the police or a possessory interest in the particular item seized (People v Rivera, 78 AD3d 1202, 1203 [2d Dept 2010], lv denied 16 NY3d 835 [2011]; People v Citriniti, 303 AD2d 419, 419-420 [2d Dept 2003]). Proof sufficient to establish standing, however, may be based on the evidence elicited during the People’s direct case during a suppression hearing (People v Gonzalez, 68 NY2d 950, 951 [1986]).
In New York, an overnight guest may have a legitimate expectation of privacy in premises that are not his own (People v Ortiz, 83 NY2d 840, 842 [1994]; People v Kemp, 273 AD2d 806, 806 [4th Dept 2000]; People v Williams, 181 AD2d 474, 475 [1st Dept 1992], lv denied 79 NY2d 1055 [1992]; People v Jones, 20 Misc 3d 1133[A], 2008 NY Slip Op 51715[U], *4 [Sup Ct, NY County 2008]; compare People v Blake, 61 AD3d 770, 770 [2d Dept 2009], lv denied 12 NY3d 923 [2009] [apartment where defendant arrested not his residence and no proof presented that he had a reasonable expectation of privacy therein]; People v Gonzalez, 45 AD3d 696, 696 [2d Dept 2007], lv denied 10 NY3d 811 [2008] [casual visitor lacks standing to contest search of premises]; People v Santiago, 304 AD2d 407, 407 [1st Dept 2003], lv denied 100 NY2d 542 [2003] [defendant failed to establish standing in mother’s bedroom closet]; People v Singleton, 238 AD2d 146, 147 [1st Dept 1997], lv denied 90 NY2d 911 [1997] [no reasonable expectation of privacy where defendant provides police with alternate address]; People v Secrest, 236 AD2d 839, 840 [4th Dept 1997], lv denied 90 NY2d 863 [1997] [defendant fails to establish reasonable expectation of privacy in girlfriend’s home]; People v Aguirre, 220 AD2d 438, 439 [2d Dept 1995] [transient has no legitimate expectation of privacy in apartment]; People v Mercica, 170 AD2d 181, 181-182 [1st Dept 1991], lv denied 77 NY2d 964 [1991] [mere invitee lacks standing to challenge search of apartment]).[3]
The defendant testified before the grand jury that on the night of his arrest he was in the apartment of his “lady friend” *741 when her grandson rang the doorbell. He claimed he had been involved in a relationship with Ms. Diaz for more than a year and that although he did not live with her, he shared her bed most weekend nights. He also testified he had a dresser drawer with some clothes inside that he left in the apartment and which Ms. Diaz regularly washed. In addition to the defendant’s grand jury testimony, Police Officer Cuevas testified, at the suppression hearing, that Ms. Diaz informed the police, prior to their search, that the defendant’s possessions were on the left side of the bedroom. In addition, Cesar Pabon testified at the suppression hearing that whether the defendant was staying overnight in the subject apartment was an ongoing issue he had with his grandmother.
Although the primary purpose of the defendant’s grand jury testimony appears to be to minimize his legal attachment to the apartment where the weapon was recovered, I find that the defendant met his burden of establishing a legitimate expectation of privacy in the area searched (Ponder, 54 NY2d at 166). As such, defendant has standing to contest the search and seizure of the weapon from the apartment in which he was an overnight guest (Williams, 181 AD2d at 475).
In the pending matter, the police never obtained, nor attempted to obtain, a search warrant for Ms. Diaz’s residence. The Fourth Amendment’s requirement of a search warrant prior to the search of a private residence is vitiated when voluntary consent to search is granted by a person with apparent authority. The People bear a “heavy burden” in proving that consent to search was voluntarily given (People v Gonzalez, 39 NY2d 122, 128 [1976]; People v Whitehurst, 25 NY2d 389, 391 [1969]; People v Springer, 92 AD2d 209, 212 [2d Dept 1983]). Voluntary consent is “a true act of the will, an unequivocal product of an essentially free and unconstrained choice” (Gonzalez, 39 NY2d at 128) and it is “incompatible with official coercion, actual or implicit, overt or subtle” (id.). Whether the consent to search is voluntary is a question of fact which must be determined by a totality of the circumstances in any particular case. There is no “bright-line” test of voluntariness and no one factor in and of itself will be determinative. The form of consent is also not determinative, since a valid consent can be oral (People v Bongiorno, 243 AD2d 719, 720 [2d Dept 1997], lv denied 91 NY2d *742 889 [1998]) written (People v Bell, 197 AD2d 583, 584 [2d Dept 1993], lv denied 82 NY2d 922 [1994]) or implied by specific conduct (People v Moran, 68 AD3d 786, 787 [2d Dept 2009], lv denied 15 NY3d 776 [2010]; Matter of Jermaine W, 210 AD2d 236, 237 [2d Dept 1994]).
Defendant contends the People failed to obtain valid consent to search Elsa Diaz’s apartment because she was too intoxicated to provide legally sufficient voluntary consent. In support thereof, the defendant relies upon the testimony of Cesar Pabon, to the extent he testified that his grandmother was intoxicated on the night in question, and upon the testimony of Police Officer Cuevas that Ms. Diaz appeared erratic and overly emotional.[4]
Before a suspect’s statements to the police can be held to be involuntarily made, based solely on the suspect’s intoxication, the suspect must be intoxicated to the point of “mania” (People v Schompert, 19 NY2d 300, 305 [1967], cert denied 389 US 874 [1967]; see also People v Adams, 26 NY2d 129, 137 [1970]; People v Benjamin, 17 AD3d 688, 689 [2d Dept 2005], lv denied 5 NY3d 803 [2005]; People v Shields, 295 AD2d 374, 374 [2d Dept 2002], lv denied 98 NY2d 772 [2002]).
This requirement of “mania” is also reflected in the level of intoxication required to negate an individual’s consent to search his or her property (People v Shields, 295 AD2d 374, 374 [2002]). An individual’s consent to search is admissible when he or she “was sufficiently sober to have understood his [or her] rights and to have acted voluntarily, knowingly and intelligently” (People v Kehn, 109 AD2d 912, 914 [3d Dept 1985]).
In this case, although Mr. Pah on testified that his grandmother was intoxicated, there is no evidence that Ms. Diaz “appeared confused, disoriented or unsure about what was occurring” when interacting with the police (see People v Scott, 47 AD3d 1016, 1020 [3d Dept 2008], lv denied 10 NY3d 870 [2008]). On the contrary, Ms. Diaz repeatedly answered the questions asked of her by Officer Cuevas, reflecting an understanding of the situation, and was initially reluctant to cooperate with the police or accept their offer of assistance. “Only when the degree of inebriation has risen to the level of mania or to the level where the defendant is unable to comprehend the meaning of his or her words” is a suspect’s statement suppress *743 ible or a consent to search invalid (People v Williams, 40 AD3d 1364, 1365 [3d Dept 2007], lv denied 9 NY3d 927 [2007]). Furthermore, Officer Cuevas was not required to inquire as to whether Ms. Diaz was under the influence of alcohol at the time she gave consent, since the police are under no such obligation to inquire before a defendant makes an incriminating statement (People v Chandler, 307 AD2d 585, 586 [3d Dept 2003], lv denied 100 NY2d 641 [2003]).
Defendant also challenges the authority of Ms. Diaz to consent to the police officers’ search of the defendant’s personal effects. “It is well settled that the police may lawfully conduct a warrantless search when they have obtained the voluntary consent of a party who possesses the requisite degree of authority and control over the premises or personal property in question” (People v Cosme, 48 NY2d 286, 290 [1979], citing Schneckloth v Bustamonte, 412 US 218 [1973]). Consent can be given by one co-occupant when the other co-occupant is not physically present and therefore is unable to refuse to consent. Even when the co-occupant is present, there is no affirmative duty on the police to inquire as to whether the co-occupant also consents (Georgia v Randolph, 547 US 103, 121-122 [2006]; United States v Lopez, 547 F3d 397, 399-400 [2d Cir 2008], cert denied 556 US 1138 [2009]). The police may not, however, search a residence, even with the consent of one resident, when a co-occupant is physically present and refuses to consent (Georgia v Randolph, 547 US at 114), and the police may not remove a defendant from a residence with the express goal of preventing him from objecting to a warrantless search of his premises (Georgia v Randolph, 547 US at 121; People v McClain, 61 AD3d 416, 417 [1st Dept 2009], lv denied 13 NY3d 747 [2009]).
An issue in this case is whether the defendant was a resident, or co-occupant, of the apartment where the weapon was ultimately recovered.[5] Ms. Diaz informed her grandson that the defendant did not live with her[6] and upon his arrest, the defendant gave the police a different address as his primary residence. While the recent federal cases cited above all involve co-occupants, no evidence was presented at the hearing that the defendant regularly lived in the subject apartment. The defendant did not testify at the suppression hearing to any privacy *744 interest in the apartment, and, apart from his grand jury testimony, the only evidence that the defendant had any interest in the apartment was when Ms. Diaz informed the police that the defendant stored his belongings on the left side of the bedroom.
Despite the limitations raised by Georgia v Randolph, which are not applicable in this case because the defendant was not in the apartment at the time of the search but remained in the hallway, a defendant’s live-in girlfriend may grant consent for the police to search areas of an apartment to which she has a shared right of access with the accused, including bedrooms they may share (Cosme, 48 NY2d at 292; People v Lownes, 40 AD3d 1269, 1270 [3d Dept 2007], lv denied 9 NY3d 878 [2007]; People v Carrington, 25 AD3d 440, 441 [1st Dept 2006], lv denied 6 NY3d 846 [2006]; People v Obee, 299 AD2d 426, 427 [2d Dept 2002], lv denied 99 NY2d 584 [2003]). Once granted consent to search an area or room, the police may further search any places within that area where contraband may be secreted (People v Bruno, 294 AD2d 179, 179-180 [1st Dept 2002], lv denied 99 NY2d 533 [2002]).
In the case before this court, Ms. Diaz had the apparent and legal authority to consent to a police search of the bedroom which she, at most, shared with the defendant. Although the firearm was eventually recovered from a filing cabinet in the bedroom, in other cases it has been held that a third party may give consent for the police to search a dresser drawer, despite having advised the police that the subject drawer was used solely by the defendant, because the unlocked drawer was in a dresser located in the defendant’s and the consenter’s bedroom (People v Kelly, 58 AD3d 868, 869 [2d Dept 2009], lv denied 12 NY3d 818 [2009]; People v Jackson, 170 Misc 2d 478, 484 [Crim Ct, Bronx County 1996]). A filing cabinet, even if containing solely the defendant’s personal belongings, is the functional equivalent of a dresser drawer. Once Ms. Diaz granted her consent for the police to search the bedroom, over which she possessed a shared right of access, the police had the authority to search any area where a firearm may have been secreted, including a filing cabinet located in the search area. Thus, Ms. Diaz had the legal authority to consent to the search of her bedroom and of all the areas within said bedroom.
People v Gonzalez (39 NY2d 122 [1976]) identified several factors, viewed in the totality of the circumstances, that weigh in determining the voluntariness of a consent to search. These fac *745 tors include: whether the consenter was in custody at the time she gave her consent (id. at 128); whether the consenter acted evasively in her encounter with the police (id. at 129); any threats or coercive techniques employed by the police prior to the obtaining of consent (id. at 129-130); whether the officers advised the consenter that she has the right to refuse to consent to the requested search (id. at 130); and the number of law enforcement personnel present when consent to search was granted (id. at 128-129).
In this case, even though Ms. Diaz was neither in custody, nor under arrest “in the traditional sense of those terms,” she was “assuredly not free to leave” (People v Springer, 92 AD2d 209, 213 [2d Dept 1983]). Such a custodiad situation “engender[s] an atmosphere of authority ordinarily contradictory of a capacity to exercise a free and unconstrained will” (Gonzalez, 39 NY2d at 128).
Ms. Diaz was also “un-co-operative with the law enforcement authorities” (id. at 129) before eventually consenting to the search of her apartment, having first refused to answer Officer Cuevas’ questions regarding her knowledge of a gun in the apartment, and then denying any such knowledge.
Officer Cuevas’ threat to bring in police dogs, and to prosecute Ms. Diaz for anything that the dogs might find in the apartment, does not, standing alone, negate the eventual consent to search, because Officer Cuevas had a legal basis to carry out this threat (People v Arriaga, 309 AD2d 544, 544 [1st Dept 2003], lv denied 1 NY3d 624 [2004]; see also People v Storelli, 216 AD2d 891 [4th Dept 1995] [holding that the police could threaten to obtain a search warrant if consent to search was initially denied, provided sufficient probable cause existed to obtain a warrant]). A “canine sniff,” such as the one threatened in this case, is clearly a search under article I, § 12 of the New York State Constitution (People v Dunn, 77 NY2d 19, 25 [1990]), and in the absence of a search warrant requires only “that the police have a reasonable suspicion that a residence contains illicit contraband” (id. at 26).
Officer Cuevas was not required to advise Ms. Diaz that she could refuse to grant her consent to search the apartment, but his failure to do so “may be considered in determining whether a consent was voluntary” (Gonzalez, 39 NY2d at 130). Moreover, the fact that Ms. Diaz’s right to refuse consent may have been contained within the printed consent-to-search form is “hardly an amelioration of the coercive atmosphere” (id.).
*746 While the number of police personnel present when a civilian’s consent to search is granted “does not add up to coercion per se” (People v Cameron, 73 Misc 2d 790, 798 [Sup Ct, NY County 1973]), it may heighten the present “atmosphere of authority” and render a civilian’s consent to search involuntary (Gonzalez, 39 NY2d at 128). Gonzalez held that the presence of nine federal agents rendered consent to search involuntary. People v Porter (37 Misc 2d 73 [Sup Ct, Queens County 1962]) held likewise, given the presence of eight police officers; and United States v Lewis (274 F Supp 184 [1967]) held that the immediate presence of four arresting officers was a factor contributing toward a finding of involuntary consent to search.
Here, with as many as 14 police officers in the small first floor lobby at the time Ms. Diaz “consented” to the search of her apartment, such consent was characteristic of “a submission to overwhelming authority” (Porter, 37 Misc 2d at 76) and “could hardly be characterized as freely or voluntarily given” (Lewis, 274 F Supp at 188).
Under all of the facts and circumstances in this case, including the custodial-like nature of Ms. Diaz’s interaction with Officer Cuevas, her initial evasive answers to police questioning, the officer’s threat of prosecution should Ms. Diaz refuse to consent to the search, the failure of Officer Cuevas to inform Ms. Diaz that she had the right to refuse her consent, the number of police officers present in the apartment lobby, and the “heavy burden” the law places on the prosecution to prove that the consent was voluntarily given, this court finds that the People have failed to meet their burden of proving that Ms. Diaz’s consent to search her apartment was voluntarily granted, and was not merely a submission to overwhelming police authority, and orders the suppression of all evidence recovered as a result of such search as the “fruit of the poisonous tree” (Wong Sun v United States, 371 US 471, 488 [1963]).
With respect to the statements made by the defendant during the course of the morning, I find that any statements made by the defendant prior to the recovery of the weapon are admissible,[7] since he was not in custody during that time. However, *747 any statements made after the weapon was recovered must be suppressed as a result of the illegality of the search.[8]
Based on all of the facts and circumstances, the defendant’s motions, to suppress the weapon recovered and his custodial statements made to law enforcement, are hereby granted.

. The People were given the opportunity to reopen the hearing in order to call Cesar Pabon.

. At no point were Miranda warnings administered to the defendant.

. In 1998, the United States Supreme Court rendered a decision in which the majority opinion denied standing to individuals who were only temporarily permitted on the premises but the majority of judges would have conferred standing on social guests who do not necessarily remain overnight at the *741 home of their host (Minnesota v Carter, 525 US 83 [1998]). Whether this decision eventually results in a more relaxed standard for social guests in New York jurisprudence only time will tell.

. Although she was present in the courtroom during the hearing, Elsa Diaz was not called as a witness by either party.

. This requirement is greater than what the defendant had to establish to obtain standing to contest the search in the first instance.

. Due to the intimate nature of the situation, one must take with a grain of salt what a grandmother tells her grandson about her personal affairs.

. This statement includes defendant’s bravado that despite being 40 years old, he was still fit enough to fight the young men of the building.

. This includes defendant’s custodial statement, made without Miranda warnings, or any exception to the Miranda requirement, that the gun recovered did not belong to him, and any of the spontaneous statements he made in front of the desk officer and the statement he made after finding out what he was being charged with.